GREEN HOBBS *et al. v.* SAMUEL HARLAN *et al.*

1. GUARDIAN AND WARD.    It is the general rule that a guardian will not be allowed to spend more in the education and maintenance of his ward than the interest and profits of the ward's estate, without the intervention of a court of equity.

2. SAME.    There are exceptions to this rule, and the guardian may exceed the income of his wards under strong circumstances of necessity, of which illustrations are given in the opinion.

3. SAME.    *Death of ward.*    Where one of the wards dies, the clerk and master in taking an account, after allowing the guardian for all proper and reasonable expenditures for, or on account of the deceased, will pass the balance of the estate to the surviving minor wards, and hold it for their benefit; thus increasing their annual income, without the intervention of an administration.

4. SAME.    It is the duty of a guardian to keep the fences of the farm lands of his wards in repair, and to rebuild the same if destroyed by fire, or otherwise.

5. SAME.    *Improvements.*    If a guardian, with a view to increase the annual rentals of his wards, put improvements, such as houses, upon their land, he will be allowed to reimburse himself for the principal sum thus expended, without interest, out of the increased· rentals, but

not out of the corpus of the estate or the ordinary rentals, and in no case will he be allowed to have a judgment for the same.

6. SAME. *Interest.* Guardians will be charged six per cent per annum interest, upon all moneys, unless it be shown that he received a greater sum, in which event he will be charged with the greater interest.

7. SAME. *Onus of proof for expenditures.* It is the duty of the guardian to show to the satisfaction of the court the necessity and reasonableness of each item of expenditure he has made for the ward, otherwise the item will be disallowed him in his settlement.

---

FROM WILSON.

---

Appeal from the Chancery Court at Lebanon. W. F. COOPER, Ch.

CANTRELL & SAUNDERS for complainants.

TARVER & GOLLADAY for defendants.

EAST, Sp. J., delivered the opinion of the court.

This litigation arises out of the following facts: Robert Harlan departed this life in 1862, intestate, leaving six minor children surviving him. His estate was administered. On the 6th of February, 1865, Samuel Harlan, a brother of the deceased, qualified as guardian of the children. Shortly after the death, and before the appointment of the guardian, Robert Harlan's dwelling-house, located upon a farm of 225 or or 235 acres, of which he died owner, was burned and the fences were partially destroyed. The administrator paid over to the guardian the sum of $2,081.34. The interest on this sum and the rent of the farm constituted the entire income of the children. The

children were placed by the guardian in the custody of relatives or persons in the neighborhood. They were of tender years at their father's death, were delicate in health, and two of them died while young. The other (Reuben) died after he was twenty-one. The guardian, believing that the farm would produce a greater income thereby, erected improvements upon the same, such as a dwelling-house and outhouses, at a cost of a few hundred dollars; he had rails made and placed upon the fences; had doctor's bills, clothing bills, school bills, burial expenses, etc., to pay, which largely exceeded the income of his wards. His first and only settlement was made with the county court on the 14th of August, 1872. Jonathan Hobbs married one of the girls, Franciana, before she attained her majority, and Green Hobbs took out letters of administration upon the estates of the three deceased children, and as such, he and Jonathan Hobbs and wife Franciana and the other two surviving children, James T. Harlan and Martha Harlan, the two last named minors, on the 4th of September, 1873, filed their bill against the guardian and his sureties on three different bonds, to have a settlement of the guardianship.

The defendants filed their joint answer, insisting upon the settlement made in county court, and proof was taken. The case was heard on the 6th of November, 1875, and an agreed decree was entered, requiring the clerk and master to "state an account between complainants and said Samuel Harlan, by which he will charge said Harlan with all sums which he collected for his wards, or could have collected by

Hobbs *v.* Harlan.

reasonable diligence, and crediting him with all proper disbursements." Nothing seems to have been done under this decree. On the 6th of December, 1876, another decree was entered, holding that the settlement made in the county court was erroneous, and that same be set aside and for nothing held: that an account be taken, in which the master will charge the guardian with all sums that went into his hands, or which should have come into his hands with reasonable diligence, and crediting him with all proper disbursements. The decree directs the master, in stating his account, not to credit defendant Harlan with any amount exceeding the interest on the cash assets and rents and profits from the real estate; and the decree further recites, that it appearing to the court that the guardian failed to loan out the funds of his wards, or invest them as required by law, that he be denied all compensation, that he be charged with six per cent. per annum interest on the funds, unless it be shown that he invested the funds and realized a greater amount than six per cent. On the 10th of February, 1877, the master filed a report, based upon the settlement in the county court, and which settlement he says was the only evidence before him as to the amount of money received by the guardian from the administrator. The results of the account are, the guardian is found indebted to

James T. .................................................................$614 55
Paralee's Estate.....................................................485 95
Mrs. Hobbs..........................................................346 89
Martha ................................................................346 89
Ellen's Estate........................................................542 63

Total.....................................................$2,336 91

The income of each one of these children was as follows: Interest on $346.89—$20.81. Rent of land, from $150 to $350 per year, to be divided into six parts.

The clerk would have been justified under the decree to have allowed the guardian the full income of each of his wards for his or her necessary and proper expenses, in board, education, medical bills, clothing, etc. These incomes to each child were small, being $20.81 interest and one-sixth of the rents, which after the payment of taxes, did not exceed, on an average, $30 to $40 per year f r each child, making a total income to each ward of from $50 to $60 per year; but instead of so doing, the account has been so taken as to give to five of the children only a judgment for $2,336.91, which is more, by several hundred dollars, than the original principal; and at the same time the account shows that the guardian was disallowed largely his expenditures for clothing, board, medical bills and schooling—all prime necessities. The account has not been taken in accordance with the decree, and the result is, an unjust and onerous judgment against the guardian and sureties. Harlan became guardian on the 6th of February, 1865. One of the children, Ellen, died April 22d, 1865, before the guardian had received any portion of the rent, or received the money from the administrator. She had incurred a few accounts, and what of these were reasonable and proper should have been deducted from her income for that or succeeding years until they were paid; after which, her estate remaining should have gone to her brothers

and sisters, and the income thereafter divided into five parts, thus increasing their annual income thereafter; and so on until the next one died, and after paying from the income of the estate of the latter such. reasonable charges as under the decree were allowed, then have passed the residue of the estate unexpended to the living brothers and sisters, and thus increased their incomes for the future; and so on as each child died. By this mode a larger annual income would have been made for the living children,-and therefore the guardian would have been allowed a larger sum as income, to have expended. This might have been done under the decree. Instead of so doing, the clerk and master has ascertained what was due each deceased child at the time of its death, and then added interest thereon to the taking of the account, and gave the adminisistrator judgment therefor, which of course when collected he will hand over to the surviving children. But it is insisted that the decree of the chancellor is erroneous in confining the expenditures of the guardian to the income of each ward.

It is admitted to be the general rule that a guardian cannot spend more in maintaining his wards than the interest and profits of his ward's estate, without the intervention of a court of equity: *Daws* v. *Harkness,* 6 Ill., 173; *Bybee* v. *Tharp,* 4 B. Mass., 313; *Gilbert* v. *McEachin,* 38 Miss., 499; *Brown* v. *Mullins,* 24 Miss., 204; *Villard* v. *Chovin,* 2 Strobh (S. C.) Eq., 40; *Phillips* v. *Davis,* 2 Sneed, 520; *Beeler* v. *Dunn,* 3 Head, 87; *Myers* v. *Wade,* 6 Rand (Va.) 444; *Roseborough*

18—VOL. 10.

v. *Roseborough*, 3 Baxt., 314; *Cohen* v. *Shyer*, 1 Tenn. Chan., 192.

Is this general rule not subject to some qualifications, and if so, what qualifications? It is claimed that the guardian may, on his own authority and without making prior application therefor to a court of chancery, make necessary expenditures for his wards exceeding their incomes, and that a court of equity, upon proper proceedings instituted by him, or upon his settlement, will allow him to do so, and ratify his acts. On the other hand, it is maintained that without the previous authority of the court his acts will not be confirmed. Clearly the latter is a hard and unreasonable rule, and could not be administered without shocking the sensibilities and sense of justice. There are many cases and of frequent occurrence in which great and gross injustice would be done to the parties most concerned, were it the rule.

I shall refer to only a few of the many cases of frequent occurrence, such as a personal injury to the ward involving the services of a surgeon; sickness of a protracted character, requiring expensive nursing and medical bills; death of the ward, requiring expenses for decent interment; marriage of a female ward; besides a large number of social and moral emergencies necessitating instant action on the part of the guardian, involving pecuniary obligation. Such a rule looks alone to the pecuniary estate of the ward and overlooks personal comfort, health, character, social standing, accidents and emergencies. It regards nothing but "the mint, anise and cumin," while neglecting

weightier matters. The hardship and injustice of such an inflexible rule has been obvious to the courts, and they have softened its rigor by a modification of the principle; holding that "expenditures in excess of income will not be allowed unless good reason is shown to the court, why the court was not applied to for its sanction in advance": *Cohen* v. *Shyer*, 1 Tenn. Ch., 194, and cases cited therein. It is obvious that this modification of the general rule may meet and avoid many of the hardships enumerated. What would be the "good reason," is still an open question. Expenditures beyond income made upon emergencies requiring instant action, such as injuries to the person from accidents, or disease, or death, and all that class which admit of no delay, and certainly not of the "law's delay," would be covered by the rule as modified. It would not do for a guardian to wait until the chancery court convened, before he procured medical or surgical skill for his ward, or buried his remains, or sought an asylum for his lunatic ward.

I mention these classes not as a limitation of the rule, but merely as illustrations. There are and will be, doubtless, other classes and instances affording equally "good reasons" for the failure to apply to the chancery court before incurring the expenditures or obligation, such as is claimed in this case, viz., that these transactions took place during the war, and when the courts were closed.

The case of *Roseborough* v. *Roseborough*, 3 Baxt., 314, decided by this court, goes one step in advance of the general rule as modified, and holds "when a

guardian is called on to account in a court of chan-
cery, he will be allowed such necessary and proper
expenditures as the court would have ordered, if ap-
plied to, in the first instance.    The principle of the
rule will equally apply where a party comes and asks
an approval and confirmation of his acts."    Such a
rule is obviously correct and necessary in cases where
the estate of the ward is meagre, the income small
and the expenditures proposed are less in amount than
the fees and costs of an application to court would be.
And this rule might be extended to cases in which
the fees and costs of the application would be out of
proportion to the amount proposed to be expended.    I
do not mention these as limitations, for the reason, that
no general rule applicable to all character of estates
could be safely laid down.    In the case of *Rosebor-*
*ough* v. *Roseborough,* it appears that the ward became
insane, necessitating or at least making it proper for
her comfort and health, that she be removed to an
asylum for the insane.

Her guardian met the emergency by advancing the
necessary funds for this purpose out of his own estate,
her estate consisting of a remainder interest in lands,
which the court ordered to be sold and he reimbursed.
What should the guardian have done consistent with
"decency and humanity"?    Let her run at large, or
lock her up until the next term of the chancery
court, which in this State only meets at intervals of
six months?    It may be 'that the suddenness of the
lunacy and the consequent necessity for instant action
on the part of the guardian, precluded his application

to the court in the first instance and afforded the "good reason" required for not applying; but that case is not put upon this ground.

The doctrine that the court will ratify expenditures of a guardian, over and above the income of a ward, if such expenditures are made upon "urgent necessity," or "such as could not have been foreseen and provided for," has been recognized in many well considered cases: *Prince* v. *Logan*, Spears (S. C.), 29; *McDowell* v. *Caldwell*, 2 McCord (S. C.) Ch., 43; *Johnson* v. *Coleman*, 3 Jones (N. C.) Eq., 290; *Frelick* v. *Turner*, 26 Miss., 393; *Dorney* v. *Bullock*, 7 Ire. Eq., 102. In one of the cases cited (3 Jones Eq.), the court define what would be a justifiable necessity as "a case of physical necessity." In the case in 7 Ire., it is defined with these illustrations, "such as a dearth, and consequent failure of crops, some extraordinary sickness." Schouler says: "The English rule is undoubtedly strict; but as to probate, guardians and in modern practice, legal formalities have been considerably relaxed. In most of the United States the guardian is doubtless justified in breaking the principal fund *under strong circumstances of necessity*, for the benefit of the ward, and he may leave his conduct to the subsequent approval of the court, when he presents his accounts": Schouler, 3d ed., sec. 338. The reasons for the strict rules in English courts do not apply in America. There have been developed in England no less than eleven different kinds of guardians, "guardianship of chivalry; guardianship by special custom; guardianship by appointment of the spiritua

courts; guardianship by prerogative—applying alone to the royal family; guardianship by election of infant; by nature and nurture; in socage; testamentary and chancery guardianship": See Macpherson Inf., 2. The "chancery guardianship," within the last century, has quite superseded the other kinds except testamentary guardians, and are only appointed as a general rule, where there is property. Hence, persons desiring to call in the authority of the court sometimes resort to the expedient of settling a sum of money on the minor: Macpherson Inf., 103.

Premising that all guardians in England are appointed by the court of chancery, and that it is done by petition, setting out the name, minority and property of the ward, this is followed by a reference to the master to report a fit person for guardian and the exact condition of the ward's estate; which being done and confirmed by the chancellor, the infant is thus constituted a ward in chancery. Thereupon, an annual sum arising from the income of his estate is set apart by the court and placed in the keeping of the guardian, to be expended in the maintenance of the ward, more than which he is not allowed to expend without previous permission of the court. The court is ever present and open, and I may add, unfettered in authority, to assist, advise and direct or remove the guardian. The court thus actually manages the ward's estate, makes its schemes for his maintenance, and allows the guardian a certain fixed income therefor: Schouler, sec. 323. In the United States, except where chancery guardianship is adopted, the sys-

Hobbs *v.* Harlan.

tem is entirely different. The guardian is appointed by a statutory court known by various names, such as probate court; orphan's court; surrogate court or county court, and these courts are clothed with more or less powers over the guardian, the ward and the property. In some cases the guardian is required to present his accounts in the probate courts with vouchers for expenditures once a year—in some States once in two years, and in others, once in three years; these are passed ordinarily with or without the oath of the guardian. At the termination of his guardianship, he is required to pass his final account. In some States, in doing this, he must bring forward all the items contained in his prior accounts; and in others he begins with the balance on the last account. These accounts, whether termed final or intermediate, are at best only *prima facie*, if that. The ward may, at any time during his minority, or in a reasonable time thereafter, reopen them by a bill in chancery. There is no court to which the guardian may apply for direction and advice, except the chancery court, and that only once in six months, and then by original bill, process, etc. He must make his own schemes for his ward's living and education—must meet emergencies as best he can. Were he to apply to the probate court for information or direction, the chancellor would not be bound by the advice or direction. To hold him to account on legal principles as practiced in the English chancery, is erroneous, because the conditions are not the same. The chancery court in England, in this matter, is one thing, that of the United States, another.

We therefore hold that the chancellor erred in directing the master not to allow the guardian any sum beyond the income of his ward, and that in retaking the account, he will allow the guardian as credits, all reasonable and proper sums which he paid out for either of his wards for *necessary* medical, burial, clothing, boarding and tuition. If he incurred board bills for either of his wards, when he or she would have been taken and cared for by a proper and fit relative or friend without charge, he will not be allowed for the board thus incurred. The master will enquire into the necessity of any expenditure, as well as the reasonableness of the amount of the same; *and the guardian must show both of these facts to the satisfaction of the master, otherwise he will disallow the item.*

In taking the accounts, the master will take and state it upon the principles herein set forth, that is, passing the estate of a deceased child to the survivors, and thus increasing the annual income of the latter. For all reasonable and necessary expenses incurred in putting up and keeping in repair the fences on the farm, the guardian will be credited.

It appears, from the proof, that in order to rent the farm, that some character of tenement house and improvements in the way of out houses, were reasonable and necessary, and that the houses erected by the guardian did increase the annual rentals over and above what otherwise what would have been the rents. It also appears that these improvements did not add to the permanent value of the farm, for the reason that a person able to buy a farm of that character would

Hobbs *v.* Harlan.

not desire the improvements. If the annual rental has been increased by reason of these improvements, it is but fair that the guardian should be allowed to show this fact and reimburse himself, not out of the capital of his wards or out of the ordinary rents, but out of the *increased* income, to the extent that he has collected them, but in no event will he be allowed to have a judgment against his wards, or either of them, for money thus expended, nor will he be allowed interest on the sum thus paid out. The court being of the opinion that in all cases where a guardian advances money to make improvements on the ward's estate, he must be held to do so at his own risk, and if he fails to realize increased rentals therefor, or not sufficient to repay him, he must meet the loss, and the transaction must be deprived of every feature of an investment or speculation on his part.

The master will charge the guardian six per cent per annum interest on the money which came to his hands, unless it be shown that he realized a larger rate of interest, and in this event he will be charged the greater rate.

Subject to these modifications the decree of the chancellor will be affirmed. The costs of this appeal will be paid by complainants. The case is remanded.